**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THERESA TALOFF,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:12-cv-01696** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Susan E. Cox** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Theresa Taloff, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Supplemental Security Income and Social Security Disability Insurance benefits under the Social Security Act, 42 U.S.C. §§416(1), 423, and 1381 *et seq.* ("the Act"). Ms. Taloff has filed a motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the matter for additional proceedings. For the reasons set forth below, Ms. Taloff's motion is granted and the case is remanded to the SSA for further proceedings [dkt. 19].

## I. PROCEDURAL HISTORY

Ms. Taloff filed a Title II application for a period of disability and disability insurance benefits on October 12, 2007.[1] She also protectively filed a Title XVI application for supplemental security income on September 14, 2007.[2] In each of these applications, Ms. Taloff alleged she had been unable to work since April 1, 2007, due to fibromyalgia, arthritis of the

---

[1] R. at 263-66, 267-76.
[2] R. at 126-27.

back, and thyroid disease.[3] Ms. Taloff also stated in her application that she could not lift or carry anything, that she had migraines between two and three times per week, that she had back pain, and that she could only sit or stand "for so long."[4] Ms. Taloff's applications were denied after the SSA determined that although Ms. Taloff "may have some discomfort," she was able to move around sufficiently to perform light work activity.[5] On February 9, 2009, Ms. Taloff requested a hearing before an Administrative Law Judge ("ALJ").[6] This request was granted on January 25, 1010.[7]

A hearing on Ms. Taloff's claims began on March 3, 2010; however, after discussion with the ALJ, Ms. Taloff requested to postpone her hearing so she could obtain representation.[8] On August 10, 2010, a second hearing where Ms. Taloff was represented by counsel took place before ALJ Sylke Merchan.[9] Following the hearing, the ALJ issued an unfavorable decision.[10] The Appeals Council denied Ms. Taloff's request to review the ALJ decision on January 13, 2012,[11] making the ALJ's decision the final decision of the Commissioner. Ms. Taloff filed a complaint in this Court on March 8, 2012[12]

## II.    STATEMENT OF FACTS

The facts set forth in this section are derived from the administrative record. We begin with an overview of Ms. Taloff's medical conditions both before and after the alleged onset date. We then summarize the ALJ hearing testimony and the ALJ's decision.

---

[3]R. at 286, 291; *see* R. at 263-64, 269.
[4]R. at 291.
[5]R. at 128, 138.
[6]R. at 144-46.
[7]R. at 162.
[8]R. at 117.
[9]R. at 35.
[10]R. at 18-27.
[11]R. at 1-5.
[12]Dkt. 1.

### A.	Ms. Taloff's Background and Medical Records

Ms. Taloff was born on August 7, 1959, and at the time of the ALJ's decision she was 51 years old. Since at least 2003, she has been treated for a wide variety of medical conditions, including: migraine headaches;[13] carpal tunnel syndrome;[14] back pain;[15] radiculopathy in her lower extremities;[16] fibromyalgia;[17] hypothyroidism;[18] sleep apnea;[19] stomach pain,[20] and other gastrointestinal ailments, including irritable bowel syndrome,[21] dyspepsia,[22] gastroesophogeal reflux disease,[23] hepatitis,[24] pancreatitis,[25] and hepatic cysts;[26] and osteoarthritis of the left knee.[27] At 5'1" tall and 248 pounds at the time of the hearing,[28] Ms. Taloff had a body mass index of 47,[29] rendering a condition of "extreme obesity."[30] Here, we will briefly review the medical conditions Ms. Taloff claims were not properly assessed by the ALJ.

### 1.	Migraine Headaches

It is well documented that Ms. Taloff has suffered from and been treated for migraines since at least 2003, when she sought treatment from Armita Bijari, M.D., at Neurological Care Specialists, S.C.[31] Dr. Bijari treated Ms. Taloff for common migraine headaches and tension

---

[13]*See* R. at 336, 380, 776.
[14]R. at 767, 792.
[15]R. at 780.
[16]R. at 787, 790.
[17]*See* R. at 361, 767.
[18]R. at 703.
[19]R. at 442.
[20]R. at 520, 704.
[21]R. at 717.
[22]R. at 398.
[23]R. at 383.
[24]R. at 519.
[25]R. at 736.
[26]R. at 682-83.
[27]R. at 408.
[28]R. at 403.
[29]NHLBI, Obesity Guidelines - Body Mass Index Table 2, National Institutes of Health, http://www.nhlbi.nih.gov/guidelines/obesity/bmi_tbl2.htm (last visited Feb. 13, 2013).
[30]SSR02-1p (stating that BMIs greater than 40 constitute extreme obesity).
[31] R. at 330, 334-58.

headaches with a variety of different medications, and it appears that generally Ms. Taloff saw Dr. Bijari approximately one time per month.[32] Although the effect of the prescribed medications on Ms. Taloff's migraines varied widely,[33] many if not all of them stopped working at one point or another. For example, between August 2003 and January 2004, Ms. Taloff's migraines appeared to be mostly controlled by Zomig and Topamax, which reduced their frequency and severity;[34] however, by March and April of 2004 they had increased in frequency[35] (although they subdued again in May).[36] This type of fluctuation continued from 2004 through 2006, with Ms. Taloff reporting some months that she was doing well,[37] and at other times that her headaches had increased in duration and/or frequency.[38] By May 2006, Dr. Bijari reported that "Naprosyn, Elavil, Flexeril and Topamax [had] not helped" Ms Taloff.[39]

Although it appears from the record that Ms. Taloff stopped seeing Dr. Bijari in 2006,[40] she continued to receive treatment for her migraines, and remained on medication for them. After the alleged onset date of April 1, 2007, Ms. Taloff received additional, though limited, treatment for her migraines.[41] For example, in February and April 2008, Ms. Taloff received follow-up treatment from Cindy Mangene, FNP for her migraines (among other issues), and was again prescribed Zomig.[42] Additionally, when Ms. Taloff was treated for generalized pain in March 2010, she also complained of headaches.[43]

---

[32] *See* R. at 335, 336, 361.
[33] *See* R. at 330, 334-58.
[34] R. at 353-58.
[35] R. at 352-53.
[36] R. at 350.
[37] *See* R. at 335, 338-41, 344, 346, 349.
[38] *See* R. at 330, 336-37, 342, 345, 347-48.
[39] R. at 336.
[40] *See* R. at 335, dated May 16, 2006, which appears to be the last update from Dr. Bijari.
[41] *See* R. at 759, 777-79 (discussing Ms. Taloff's treatment for migraines in August and September 2010).
[42] R. at 380-81.
[43] R. at 696.

## 2. Carpal Tunnel Syndrome

Although Ms. Taloff's carpal tunnel syndrome is not as well documented as her migraines, references to it are scattered throughout her medical records. In December 2002, Ms. Taloff was diagnosed with "possibly severe" bilateral carpal tunnel syndrome.[44] At that time, she reported "numbness and tingling in both hands for quite a number of years progressively worsening."[45] Nerve conduction studies indicated "[m]ild right median nerve compression at the wrist with a mild slowing of motor and sensory conduction and a normal needle examination," and "[n]ormal sensory nerve conduction studies for the left upper extremity with no evidence to suggest median nerve compression at the wrist."[46] In August 2004, Ms. Taloff received treatment for pain in her hands, back and feet; however, Thomas F. Morris, D.O, the treating physician, made no note of carpal tunnel syndrome.[47] After the alleged onset date, in September 2010, she received an MRI of the bilateral wrists, which was negative;[48] however, an electromyographic and electrodiagnostic consultation showed "electrodiagnostic evidence of a moderate right sensory motor median mononeuropathy at the wrist (carpal tunnel syndrome) with associated denervation."[49]

## 3. Fibromyalgia and Other Pain

In May 2003, Ms. Taloff was diagnosed with fibromyalgia by Sherine Parimanath, M.D.[50] Dr. Parimanath noted that Ms. Taloff had "multiple diffuse tender points,"[51] and that she reported "increased fatigue with concomitant weight gain and increased diffuse pain involving

---

[44] R. at 750.
[45] *Id.*
[46] R. at 752.
[47] R. at 532.
[48] R. at 790.
[49] R. at 792.
[50] R. at 753-60.
[51] R. at 758.

her muscles and joints" for the past four years.[52] Dr. Parimanath also discussed Ms. Taloff's sleep apnea.[53] She informed Ms. Taloff that proper sleep helps improve and control symptoms of fibromyalgia, and that she should be sure to use the continuous positive airway pressure machine she had been prescribed to treat her sleep apnea (which she had not been using at that time because the mask did not fit her properly[54]).[55]

Ms. Taloff was also treated at various times for pain in her feet, hands, and back. She was treated for arthralgias and swelling in her ankles as early as September 2003,[56] and in March 2003 she was treated for chronic low back pain, which she stated she had been experiencing for about eighteen years.[57] Ms. Taloff also told Dr. Morris that the pain was worse when she was at work or doing any housework, that bending over at the waist seemed to worsen it, and that days she had to work were "hell."[58] She was again treated for pain in March 2004 due to an injury to her left knee,[59] and in August 2004 for pain in her hands, back, and feet.[60] In January 2009, Ms. Taloff went to the emergency room, complaining of body numbness, body aches, and "generalized pain, all over."[61] She initially ranked her pain level at 6 out of 10, but after being prescribed Toradol, rated her pain level at 0 out of 10 by the time of her discharge.[62] She was again treated for pain in March 2010, where she rated her pain at 10 out of 10 and also

---

[52] R. at 752.
[53] R. at 755.
[54] *Id.*
[55] R. at 758.
[56] R. at 542.
[57] R. at 550.
[58] R. at 542.
[59] R. at 539.
[60] R. at 532.
[61] R. at 507, 503.
[62] R. at 508.

complained of headaches,[63] and experienced left-side abdominal pain in May 2010, when she was diagnosed with irritable bowel syndrome.[64]

### 4. Consultative Examinations

On February 22, 2008, Ms. Taloff underwent her consultative examination with Phong T. Dao, D.O., an examiner for the Department of Social Services Disability and Adult Programs.[65] Dr. Dao noted that Ms. Taloff was able to drive to the office.[66] Ms. Taloff reported that she had "had back pain since after she gave birth to her son in 1985," and described her lower back pain as "an aching dull pain that worsens with prolonged standing or sitting."[67] Ms. Taloff also stated that taking pain medication helps her back pain, and that when she is at home, "she tries to avoid bending down to lift objects because of the back pain."[68] She also noted that she had experienced left knee pain since 2004, which she described as "an aching pain" which worsened "with squatting down to pick up objects or cleaning the floor."[69]

Dr. Dao assessed Ms. Taloff with the following: low back pain and left knee pain due to osteoarthritis; obesity with excess fat tissue, likely contributing to the left knee pain and low back pain; fibromyalgia, contributing to the generalized pain throughout Ms. Taloff's body, especially her shoulder joints, posterior neck area, upper back, lower back, arms, knees and buttocks; bilateral wrist pain, likely due to carpal tunnel syndrome; a history of hyperlipidemia; and a history of Hashimoto's thyroid disease.[70] Dr. Dao's functional assessment was that Ms. Taloff can "lift or carry, push or pull 20 lbs. occasionally and 10 lbs. frequently," "can stand or

---

[63] R. at 696.
[64] R. at 717.
[65] *See* R. at 401-7.
[66] R. at 401.
[67] *Id.*
[68] R. at 401-2.
[69] R. at 402.
[70] R. at 406.

walk for up to six hours in an 8-hour workday," and "can sit for up to six hours in an 8-hour workday."[71] He also found that Ms. Taloff's "[c]limbing, stooping, kneeling and crouching should be limited to occasionally."[72]

On March 12, 2008, F. Kalmar, M.D. conducted a physical residual functional capacity assessment of Ms. Taloff for the Social Security Administration.[73] Dr. Kalmar's findings were nearly identical to Dr. Dao's findings, and he stated that Ms. Taloff complained of headaches and has had back pain, left knee pain, carpal tunnel, and fibromyalgia. He also determined that Ms. Taloff had pain on 12 of 18 trigger points, tenderness to palpation in the back, mild disc degeneration, early osteoarthritis, and a history of thyroid disease.[74] Dr. Kalmar found that Ms. Taloff could lift 20 pounds occasionally and 10 pounds frequently, can stand or walk for up to 6 hours in an 8-hour workday, can occasionally climb, stoop, kneel or crouch, and that her credibility was partially supported by her conditions.[75]

## B.     The ALJ Hearing and Opinion

### 1.     Summary of Testimony at the ALJ Hearing

Ms. Taloff's hearing before the ALJ took place on August 10, 2010, in Orland Park, Illinois.[76] Ms. Taloff,[77] her sister,[78] and a vocational expert ("VE")[79] were all present and testified. Ms. Taloff was represented and questioned by Roger Hutchinson, her attorney.[80]

---

[71] *Id.*
[72] *Id.*
[73] *See* R. at 390-96.
[74] R. at 396.
[75] *Id.*
[76] R. at 35.
[77] R. at 49.
[78] R. at 83.
[79] R. at 89.
[80] R. at 38.

### a.       Ms. Taloff's Testimony

Ms. Taloff began her testimony by discussing problems with her memory, and said when she speaks about her medical history, she has problems explaining which doctors she saw when.[81] She stated her memory had gotten worse over the last 10-15 years.[82] Mrs. Taloff next testified that her migraines began when she gave birth to her daughter in 1986, and that she started seeing doctors for her migraines between 2002 and 2005.[83] She stated that since 2007, her migraines had gotten worse, and that by the time of the hearing she could have three or four per day.[84] She testified that Zomig had helped to stop her migraines, but that she was currently on Topomax, which did not work as well, because her doctor would not prescribe Zomig.[85] Ms. Taloff additionally said that she had migraines for more than half of each month, particularly around her menstrual time.[86] When she had migraines, Ms. Taloff testified that she had to stay in bed and try to sleep because they hurt so badly.[87] She also stated that she has a difficult time concentrating when she is having a migraine, and that she cannot think or talk.[88]

Ms. Taloff additionally testified that she had pain all over her body from fibromyalgia, including on her neck and her back.[89] She had tested positive for arthritis, but not rheumatory arthritis, and was on pain medication for that but not for her back pain or fibromyalgia.[90] She stated that because she has to take Synthroid on an empty stomach, but has to take her migraine medication on a full stomach, she would often have to eat when she woke up in order to take her

---

[81]R. at 49-50.
[82]R. at 50.
[83]R. at 50-51.
[84]R. at 51.
[85]R. at 51-52.
[86]R. at 53.
[87]R. at 54.
[88]R. at 55.
[89]R. at 55-56.
[90]R. at 56.

migraine medication, and forego the pain medication for her fibromyalgia.[91] With regard to her carpal tunnel syndrome, Ms. Taloff testified that she cannot write because her fingers go numb, and that she used to cut hair but no longer can because of the numbness.[92]

Upon examination by the ALJ, Ms. Taloff testified that her sister and daughter did the cooking, cleaning, and laundry at her house.[93] She said that she could not hold her arms up or do her hair because of her fibromyalgia, but that otherwise she was able to take care of her personal needs, such as showering, brushing her teeth, and putting her clothes on.[94] She testified that unless she was seated in a "good position," she could not sit for very long, "[a]t the most, maybe 10 minutes if that."[95] She was unable to guess how long she could stand in one position without moving, but said that on some days she is able to walk down the block.[96] While being questioned by her lawyer, Ms. Taloff additionally testified that she thought she could lift one gallon of milk, but did not think she could lift two.[97] She stated that she sometimes wakes up at 4:00 a.m. because of pain in her back, legs, neck, and colon spasms, and that even if she is not having migraines, she feels tired and "wiped out" during the day.[98] She had recently undergone physical therapy at Oak Forest Hospital, and stated that she was also doing exercises at home, but that they were not helping.[99]

Ms. Taloff additionally testified about the inflammation in her hands and feet. She said that her feet often swell, and that it is very painful.[100] She stated that when her feet swell,

---

[91] R. at 59.
[92] R. at 61.
[93] R. at 61.
[94] R. at 63.
[95] R. at 65.
[96] R. at 66.
[97] R. at 67.
[98] R. at 73.
[99] R. at 73.
[100] R. at 76.

normally she lays down to put them up, and that helps them feel better.[101] She noted that she has told her doctors about the swelling, but that she has not been treated for it.[102] Ms. Taloff also testified that she had hand swelling due to her arthritis.[103]

In terms of her living situation, Ms. Taloff testified that she had moved to California for a short period of time to live with her mother, but had returned to Illinois because her condition had deteriorated and she needed her sister to take care of her.[104] She said that she had previously moved to California to try to help her mother, but was unable to meet her needs.[105]

### b.   Patricia Altipeter's Testimony

Next, Ms. Taloff's sister, Patricia Altipeter, testified.[106] She testified that she saw her sister between three and four times per week, and accompanied her to doctors' appointments.[107] She stated that she went with her sister to appointments because her sister's memory is not very good, and she does not always remember what the doctors tell her.[108] Ms. Altipeter also testified that because of her fibromyalgia, Ms. Taloff "wakes up and goes to bed completely inflamed," and that although both she and her sister have fibromyalgia, Ms. Taloff's is more severe.[109] Ms. Altipeter also stated that Ms. Taloff has migraines for about half of each month, and that when she has migraines she cannot focus and most of the time would "just rather lay down and be in a dark place because they hurt so bad."[110] She testified that she had noticed her sister get "[m]uch

---

[101]R. at 76.
[102]R. at 77.
[103]R. at 77.
[104]R. at 81.
[105]R. at 81-82.
[106]R. at 83.
[107]R. at 84.
[108]R. at 84-85.
[109]R. at 85.
[110]R. at 87.

worse" over the last couple of years.[111] Ms. Altipeter also noted that her sister was not taking medication for her fibromyalgia because she did not have insurance.[112]

### c.     VE's Testimony

Lastly, the VE testified.[113] She had reviewed Ms. Taloff's past relevant work, from 1995 through the date of the hearing, and stated that Ms. Taloff had previously worked a "combination billing clerk and collections clerk," and as a telemarketer, and that both are sedentary positions.[114] She stated that a hypothetical person of Ms. Taloff's age, education and work experience, who was able to do work at the light exertional level but was limited to sedentary work with only occasional postural limitations, and unable to use ladders, ropes or scaffolds may be able perform her past relevant work.[115] She elaborated that if there was a sit/stand option, it was important that the person be able to stay on task while standing, stating "[t]hat's the key. If they can remain on task, stay on the phone, type, take notation, do documentation, file, whatever is required and they're not off task while standing, then they could do the past relevant work."[116] When asked if in her experience, a billing clerk, collections clerk or telemarketer could remain on task while standing, the VE responded that "[i]t depends on how long they have to stand, and it depends on if they're off task, because you can stand while talking on the phone."[117]

However, the VE additionally testified that if this hypothetical person would have to be off work at least three days per month due to symptoms from their impairments or side effects from the individual's medications, "[t]here would be no work that would be full-time

---

[111]R. at 89.
[112] R. at 87.
[113]R. at 89.
[114]R. at 91.
[115]R. at 93-94.
[116]R. at 93.
[117]R. at 94.

competitive work."[118] She also stated that if the person could only use his or her hands on an occasional basis, that would preclude past relevant work, and "substantially erode the occupational base," and that if the person were off task for more than fifteen percent of the day, that would preclude past relevant work and all other jobs.[119]

## 2. ALJ's Decision

In an opinion issued October 28, 2010, the ALJ concluded that Ms. Taloff had not been disabled from April 1, 2007 until the date of the decision within the meaning of the Act, both in terms of a period of disability and disability insurance benefits, and supplemental security income.[120] The ALJ concluded that although Ms. Taloff had the severe impairments of obesity, fibromyalgia, thyroid disease, lumbar degenerative disc disease, sleep apnea, and carpal tunnel syndrome,[121] she had the residual functional capacity ("RFC") to perform sedentary work with certain restrictions,[122] and was capable of performing past relevant work.[123]

SSA regulations prescribe a five-step sequential evaluation process for determining whether an individual is disabled.[124] The steps are followed in order, and if it is determined that the claimant is or is not disabled at any step, the evaluation does not go on to the next step. The ALJ's first step is to determine whether the claimant is presently engaged in substantive gainful activity, which would preclude a finding of disability.[125] In the present case, the ALJ determined that Ms. Taloff had not engaged in substantial gainful activity since April 1, 2007, the alleged

---

[118]R. at 95.
[119]R. at 95, 97.
[120]R. at 26-27.
[121]R. at 20.
[122]R. at 21.
[123]R. at 26.
[124]20 C.F.R. §§ 404.1520(a), 416.920(a).
[125]20 C.F.R. §§404.1520(b), 416.920(b).

onset date.[126] The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[127] In this case, the ALJ found that Ms. Taloff has the following severe impairments: obesity, fibromyalgia, thyroid disease, lumbar degenerative disc disease, sleep apnea, and carpal tunnel syndrome.[128]

The ALJ's third step is to consider whether the claimant's impairment or combination of impairments meets or medically equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[129] In the present case, the ALJ determined that Ms. Taloff's impairments did not meet or medically equal a listed impairment under 20 C.F.R. Part 303, Subpart P, Appendix 1.[130] She considered Ms. Taloff's lumbar degenerative disc disease under section 1.04 of the Listing (Disorders of the Spine), and determined that Ms. Taloff had not established all of the required criteria, and particularly had "not established a disorder of the spine resulting in compromise of a nerve root or spinal cord with evidence or nerve root compression accompanied by sensory or reflex loss and positive straight-leg raising."[131]

The ALJ next considered Ms. Taloff's carpal tunnel syndrome and degenerative joint disease under section 1.02 of the Listing (Major Dysfunction of a Joint), finding that Ms. Taloff had "not established a major dysfunction of a joint resulting in an inability to ambulate or perform fine and gross movements effectively.[132] The ALJ additionally considered Ms. Taloff's sleep apnea under section 3.10 (Sleep-Related Breathing Disorders), and found that Ms. Taloff did "not have cor pulmonale, and [had] not established" any of the listing criteria.[133] Finally, the

---

[126] R. at 20.
[127] 20 C.F.R. §§ 404.1520(c), 416.920(c).
[128] R. at 20.
[129] 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.
[130] R. at 20-21.
[131] R. at 20.
[132] R. at 21.
[133] *Id.*

ALJ considered Ms. Taloff's thyroid disorder under section 9.02 of the Listing (Thyroid Disorders), and found that Ms. Taloff had "not established the criteria for any other body system."[134]

In the event that no impairments are found to meet SSA listing requirements, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform her past relevant work.[135] This involves evaluating the claimant's RFC based on the record and her testimony, and comparing it to the requirements of her past work.[136] If determining the claimant's RFC requires the ALJ to assess subjective complaints, then she follows a two-step process.[137] First, she determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[138] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on her ability to do basic work activities.[139] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is not found to be disabled.[140]

In the present case, the ALJ found that Ms. Taloff had the RFC "to perform sedentary work" as defined in 20 C.F.R. Section 404, Part 1567, Subpart A and Section 416, Part 967, Subpart A, except that Ms. Taloff "should never climb ladders, ropes, or scaffolds, and only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl."[141] In terms of Ms.

---

[134]*Id.*
[135]20 C.F.R. § 404.1520(a)(4)(iii).
[136]*Id.*
[137]*Id.* § 1529.
[138]20 C.F.R. § 404.1529(b).
[139]*Id.* § 404.1529(c).
[140]*Id.* § 404.1520(a)(4)(iv).
[141]R. At 21.

Taloff's subjective complaints, although the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," she also found that Ms. Taloff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with her RFC assessment.[142]

In assessing Ms. Taloff's credibility, the ALJ relied heavily on her ability to engage in daily activities.[143] The ALJ specifically noted that Ms. Taloff "reported that she could do light chores such as light laundry and cleaning . . . assists her elderly mother with care, cooks, and does light housework."[144] She additionally noted that Ms. Taloff "drives and goes grocery shopping, and spends time in the community pool and hot tub."[145] The ALJ also recognized Ms. Taloff's testimony "that her daughter and sister clean and cook, and that she is unable to lift her arms to care for her hair."[146] On that basis, the ALJ determined that Ms. Taloff's "reported activities of daily living are not inconsistent with" her RFC assessment.[147]

The ALJ also found that the objective evidence of record did not support the extent and severity of Ms. Taloff's subjective complaints.[148] In this assessment, the ALJ stated that although fibromyalgia had been documented since the alleged onset date, it was not clear as to the severity.[149] Additionally, the ALJ stated that Ms. Taloff had "received only limited treatment for her carpal tunnel syndrome and back pain" since the alleged onset date, "generally presented with transient complaints or whole body pain," and had only received additional treatment for

---

[142]R. At 22.
[143]*See* R. At 24.
[144]*Id.*
[145]*Id.*
[146]*Id.*
[147]*Id.*
[148]*Id.*
[149]*Id.*

pain in August 2010.[150] While noting additional treatments Ms. Taloff had undergone, the ALJ nonetheless did not include any additional manipulative limitations, stating "the record does not establish limitations in grip strength, and the claimant exhibited 5/5 strength in all extremities on consultative examination. Moreover, the claimant reported that she is able to read, cook, perform some light household chores, and grocery shop, all of which would require the use of her hands."[151]

With regard to opinion evidence, the ALJ noted that she gave great weight to the opinions of the State agency physicians and the consultative examiner, because their opinions were "consistent with the evidence of record that was before them at the time."[152] However, she found that evidence submitted after the date of the state examinations further limited Ms. Taloff and, therefore, limited her to sedentary work with occasional postural limitations.[153] The ALJ also discredited Ms. Taloff's headache RFC questionnaire,[154] because it was unclear whether the person who completed the form was a physician, and the individual who signed the form had only treated Ms. Taloff twice in three months before completing it.[155] Additionally, the ALJ stated that Ms. Taloff "has received only limited treatment for headaches," and that although Ms. Taloff has received "frequent treatment for headaches prior to her alleged onset date . . . these were generally controlled on medication."[156]

The ALJ also took note that a physician had "opined that the claimant had an impairment that limited her ability to perform full-time work from February 2, 2008 through August 1,

---

[150]R. at 25.
[151]Id.
[152]Id.
[153]Id.
[154]R. at 770-75
[155]R. at 25.
[156]Id.

2008."[157] However, the ALJ then went on to state that "[t]his opinion [was] based simply on her diagnosis of fibromyalgia," and there was "no explanation as to why the claimant could not perform full time work, or what her function-by-function limitations were."[158] She gave this opinion little weight.[159]

The ALJ additionally determined that Ms. Taloff was "capable of performing past relevant work as a billing clerk, collections clerk, and telemarketer," and that this work did "not require the performance of work related activities precluded by" Ms. Taloff's RFC.[160] The ALJ additionally noted that each of these jobs were sedentary, with specific vocational preparations between 3 and 5.[161] In comparing Ms. Taloff's RFC "with the physical and mental demands of this work," the ALJ found that Ms. Taloff was "able to perform it as actually and generally performed."[162] Because the ALJ found that Ms. Taloff could perform her past relevant work, she did not proceed to the fifth step of the analysis.

## III.   STANDARD OF REVIEW

This Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[163] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[164] To be supported by substantial evidence, the findings must be such that a reasonable mind might accept them as adequate to support the conclusion.[165] The standard of review is deferential, but the reviewing

---

[157] *Id*; *see* R. at 421.
[158] R. at 25.
[159] R. at 26.
[160] *Id.*
[161] *Id.*
[162] *Id.*
[163] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[164] *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).
[165] *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

court must conduct a critical review, considering both evidence that supports and evidence that detracts from the Commissioner's decision.[166] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the court.[167] Although the ALJ need not address every piece of evidence or testimony presented, she must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[168] The court will conduct a critical review of the evidence, and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[169]

## IV.     ANALYSIS

Ms. Taloff argues that the ALJ erred: (1) when she failed to properly analyze Ms. Taloff's migraines and failed to explain why no limitations from migraines were established;[170] (2) when she found that Ms. Taloff's carpal tunnel syndrome was a severe impairment but failed to include any limits affecting her hands in her RFC analysis;[171] (3) by failing to consider the effects of the combination of Ms. Taloff's impairments;[172] and (4) by not analyzing Ms. Taloff's pain as required by SSR 96-7p.[173] Though we only find error with respect to the analysis of Ms. Taloff's migraines, we briefly review all of Ms. Taloff's arguments.

---

[166]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[167]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).
[168]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).
[169]*Clifford v. Apfel*, 227 F.3d 863, 839 (7th Cir. 2000).
[170]Dkt. 18 at 6-9.
[171]*Id.* at 9-12.
[172]*Id.* at 12-17.
[173]*Id.* at 18-19.

### A. Migraine Headaches

Despite extensive evidence in the record regarding the fluctuating severity of Ms. Taloff's migraines going back to 2003, the ALJ minimally disposed of the issue, stating in relevant part:

> I give little weight to the headache Residual Functional Capacity Questionnaire at Exhibit 30F as it is not supported by the record. It is unclear whether the person completing this form is a physician, and this individual had treated the claimant only twice in three months before completing this form. At the claimant's initial complaints, she reported many complaints, however headaches were not reported. At a follow-up in June 2010, the claimant did report headaches, however the frequency and intensity were not noted. Most recently, the claimant has received only limited treatment for headaches. The claimant did receive frequent treatment for headaches prior to her alleged onset date, but these were generally controlled on medication.[174]

Although the ALJ was "not required to mention every piece of evidence" in the record, she was required to "provide 'an accurate and logical bridge' between the evidence and the conclusion" to allow this Court to provide Ms. Taloff a "meaningful judicial review."[175] Despite the ALJ's statement that Ms. Taloff's migraines were "generally controlled on medication," she did not address the evidence in the record showing a fluctuation in the severity of Ms. Taloff's migraines going back to 2003. Ms. Taloff's migraines were apparently severe enough for her to seek treatment from Dr. Birjari, a neurologist, and yet the ALJ did not note that Dr. Birjari reported several times that various medications failed to reduce the severity or frequency of Ms. Taloff's headaches.[176] In fact, Ms. Taloff sought additional treatment for her migraines since the onset date, including medication refills,[177] generalized treatment,[178] and treatment at an

---

[174]R. at 25 (internal citations omitted).
[175] *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).
[176]R. at 336.
[177] R. at 380-81.
[178] R. at 696.

emergency room.[179] At the hearing before the ALJ, Ms. Taloff testified that her migraines had been getting progressively worse, and that by the date of the hearing she often experienced three or four each day,[180] and suffered from migraines for more than half of each month.[181] She also stated that when she was suffering from migraines, she would have to lay down in a dark room.[182] All of this testimony was corroborated by Ms. Taloff's sister, Ms. Alitpeter, who testified that Ms. Taloff suffered from migraines for half of each month,[183] frequently woke up with migraines and would have to go back to bed,[184] and that when Ms. Taloff was suffering from a migraine, she was unable to focus and wanted to lay down in a dark room.[185]

The ALJ's statement that Ms. Taloff's migraines "were generally controlled on medication" failed to take the full record and the testimony from Ms. Taloff's hearing into account. An ALJ is "required to evaluate whether [a claimant's] statements about the intensity and persistence of his pain [are] consistent with the available evidence,"[186] and "an ALJ may not disregard a claimant's testimony about the severity of her symptoms without providing careful analysis."[187] In this case, the only analysis the ALJ provided of Ms. Taloff's testimony was with regard to her daily activities.[188] The ALJ provided no assessment of Ms. Taloff's or Ms. Altipeter's testimony, and no discussion of Ms. Taloff's prior substantial treatment for migraines

---

[179] R. at 776-77.
[180] R. at 51
[181] R. at 53.
[182] R. at 54.
[183] R. at 87.
[184] *Id.*
[185] R. at 88.
[186] *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. Ill. 2005).
[187] *Phillips v. Astrue*, 601 F. Supp. 2D 1020, 130 (N.D. Ill. 2009) (citing *Briscoe*, 425 F.3d at 353-55).
[188] *See* R. at 24.

by Dr. Birjari. Although it is possible that the ALJ could have found, based on the record, that Ms. Taloff's testimony was not credible, she was required to weigh the evidence and discuss why she came to this finding.[189] From this analysis, the Court is unable to determine whether the ALJ considered the record as a whole.[190]

## B. Carpal Tunnel Syndrome

The ALJ determined that Ms. Taloff's carpal tunnel syndrome was a severe impairment, but did not include any limitations on Ms. Taloff's use of her hands.[191] However, a severe limitation does not necessary require any limitations,[192] and in this case the ALJ's discussion of why she did not include any limitations is sufficient. Although the guidelines for evaluating a disability state that a severe impairment "significantly limits [a person's] physical or mental ability to do basic work activities,"[193] simply having a severe impairment is not determinative of whether limitations exist in that circumstance.

In addition to finding that Ms. Taloff had "received only limited treatment for her carpal tunnel syndrome" since the alleged onset date,[194] the ALJ also stated the following:

> An electromyographic and electrodiagnostic consultation revealed
> electrodiagnostic evidence of a moderate right sensory motor median
> mononeuropathy at the wrist (carpal tunnel syndrome) with associated

---

[189] *See Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001)(finding that An ALJ must not ignore entire lines of evidence that are contrary to her findings, and must at least minimally articulate her analysis of the evidence in order to produce an informed review).

[190]*Zurawski*, 245 F.3d at 889 ("[w]hile we have never required an ALJ to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits.").

[191] R. at 20.

[192]*See* 20 C.F.R. § 404.1520(c) - (e) (if a claimant has a severe impairment that does not meet the listing requirements, it is up to the ALJ to determine whether any limitations exist).

[193]20 C.F.R. § 404.1520(c).

[194]R. at 25.

denervation. However, I do not include any additional manipulative limitations as they are not supported by the record. The record does not establish limitations in grip strength, and the claimant exhibited 5/5 strength in all extremities on consultative examination. Moreover, the claimant reported that she is able to read, cook, perform some light household chores, and grocery shop, all of which would require the use of her hands.[195]

It is true that the ALJ did not explicitly take note of Ms. Taloff's testimony regarding limitations of the use of her hands, such as being unable to write[196]; however, explicit discussion of every piece of evidence in the record is not required for an ALJ's determination to stand.[197]

An ALJ "must provide particular reasons for discrediting . . . testimony concerning the severity, persistence, and limiting effect of her symptoms."[198] Here, the ALJ satisfied this requirement. In describing her reasoning for finding no additional limitations, the ALJ cited to several pieces of the record, including Ms. Taloff's consultative examination, where Dr. Dao found that Ms. Taloff did not exhibit any signs of limitations.[199] She also cited to Ms. Taloff's own testimony regarding her daily activities, which supported her determination.[200] This is sufficient to build a logical bridge between the record and the ALJ's finding of no limitations related to carpal tunnel syndrome.

### C.  Ms. Taloff's credibility

Ms. Taloff has been treated for both full-body and localized pain,[201] and has been

---

[195] *Id.* (internal citations omitted).
[196] R. at 61.
[197] *See Clifford v. Apfel,* 227 F.3d 863, 872 (7thCir. 2000).
[198] *Phillips,* 601 F. Supp. at 1020.
[199] R. at 25.
[200] *Id.*
[201] R. at 55-56, 65, 68, 402, 406, 507, 520, 704, 766-67, 780.

diagnosed with fibromyalgia,[202] irritable bowel syndrome,[203] degenerative disc disease,[204] osteoarthritis of the knee,[205] carpal tunnel syndrome,[206] and migraines.[207] These were recognized by the ALJ in her decision.[208] After a physical impairment "that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."[209] When the claimant's statements regarding the "intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."[210] An ALJ is required to provide a detailed analysis of how she determines whether a claimant's allegations of pain are credible.[211] The ALJ must "carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it" when making her decision.[212]

---

[202]R. at 361.
[203]R. at 717.
[204]R. at 787.
[205]R. at 402.
[206]R. at 792.
[207]R. at 776.
[208]See R. at 20-25.
[209] SSR 96-7p.
[210] *Id.*
[211]*Steele*,290 F.3d at 942; *Zurawski*, 245 F.3d at 887.
[212]*Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (citing Social Security Administration, "How We Evaluate Symptoms, Including Pain," 20 C.F.R. § 404.1529; "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," Social Security Ruling 96-7p, 1996 SSR LEXIS 4; *Lopez v. Barnhart*, 336 F.3d 535 (7th Cir. 2003) (per curiam); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-38 (9th Cir. 2007); Patrice Rusconi et al., "Taking into Account the Observers' Uncertainty: A Graduated Approach to the Credibility of the Patient's Evaluation," 33 J. Behav. Med. 60, 68 (2010)).

The analysis here could be more specific because it does not state why any of Ms. Taloff's representations are discredited; rather, it merely states that Ms. Taloff's "reported activities of daily living are not inconsistent with" the ALJ's RFC assessment.[213] The Seventh Circuit also requires that a judge "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week."[214] If Ms. Taloff's pain allegations are not supported by the record, such analysis must be explicit.[215] An ALJ "must consider a claimant's subjective complaint of pain if supported by medical signs and findings."[216] And even if a claimant's complaint is not fully supported by objective medical evidence, the ALJ must nonetheless "investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties."[217]

Here, the ALJ noted that Ms. Taloff's testimony included that she does light chores and housework, drives, goes grocery shopping, and spends time in the community pool and hot tub.[218] The ALJ also referenced Ms. Taloff's testimony that her sister and daughter do the cleaning and cooking, and that she is not able to lift her arms to style her hair.[219] Then the ALJ determined that this testimony was "not inconsistent with" her RFC assessment.[220] Though this

---

[213] R. at 24.

[214] *Carradine v. Barnhart*, 360 F.3d 751, 755-57 (7th Cir. 2004).

[215] *Id.*

[216] *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992); 20 C.F.R. § 404.1529).

[217] *Clifford*, 227 F.3d at 871-72 (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). This should include an analysis of factors such as the nature and intensity of the pain, potentially aggravating factors, dosage and effectiveness of pain medication, other treatment for pain relief, functional restrictions, and daily activities. *Id.*

[218] R. at 24.

[219] *Id.*

[220] *Id.*

may be sufficient, it would be prudent for the ALJ to more fully explain how she considered Ms. Taloff's claims that she had significant pain that worsened with prolonged sitting or standing, tried to avoid bending down to lift objects because of the pain, and that she did not do much housework.[221] Or that Ms. Taloff expressed that cooking was difficult, and that holding a cup of water makes her hands hurt and feel weak.[222]

The ALJ further noted that Ms. Taloff was only taking pain medication for her arthritis and not fibromyalgia;[223] however, she did not reference Ms. Altipeter's testimony that she was not taking additional medication for her fibromyalgia and related pain because she did not have health insurance.[224] This avenue, unexplored by the ALJ, could provide not only the reason that Ms. Taloff was not taking medication for her fibromyalgia, but also why she had not received significant recent treatment for her migraines or carpal tunnel syndrome. A claimant's inability to pay for treatment should be considered when determining credibility.[225]

Finally, we acknowledge that the ALJ stated that "the objective evidence of record [did] not support the extent and severity" of Ms. Taloff's subjective complaints.[226] But the ALJ's opinion merely states that, although "fibromyalgia [had] been documented since the alleged onset date, it [was] not clear as to the severity."[227] There was no further discussion of Ms. Taloff's fibromyalgia or pain allegations, except where the ALJ discredits the opinion of a

---

[221] R. at 401-2.
[222] R. at 402.
[223] R. at 22.
[224] R. at 87.
[225] *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011) (holding that "[t]he ALJ erred by drawing negative inferences from the lack of treatment without first addressing Claimant's ability to pay").
[226] R. at 24.
[227] *Id.*

physician who opined that Ms. Taloff "had an impairment that limited her ability to perform full-time work. . . ."[228] This may benefit from further review.

### D. Full combination of Ms. Taloff's impairments

The ALJ noted that Ms. Taloff had the following severe impairments: obesity, fibromyalgia, thyroid disease, lumbar degenerative disc disease, sleep apnea, and carpal tunnel syndrome.[229] But there was no analysis of how these impairments, while not debilitating on their own, might work together to create a disability. After an ALJ determines that a claimants impairments are "severe," she must "consider the *aggregate* effect of this entire constellation of ailments--including those impairments that in isolation are not severe."[230] "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."[231] This rule has best been applied in the context of arthritis, where the Seventh Circuit found that "[e]ven if [claimant's] arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritis as she but not both."[232]

---

[228] *See* R. at 25 (discrediting the doctor's opinion because it was "based simply on her diagnosis of fibromyalgia, and there [was] no explanation as to why the claimant could not perform full time work, or what her function-by-function limitations were").

[229] R. at 20.

[230] *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (quoting 20 C.F.R. § 404.1523; *Sims v. Barnhart*, 309 F.3d 424, 432 (7thCir. 2002); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000); *Cunningham v. Apfel*, 222 F.2d 296, 501 (8th Cir. 2000)) (emphasis in original). *See also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (ordering remand where the ALJ "failed to consider [the claimant's] disabilities in combination, as the cases require") (internal citations omitted).

[231] *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). *See also Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (an ALJ is required "to consider the applicant's medical situation as a whole").

[232] *Barrett*, 355 F.3d at 1068.

The Commissioner supports the ALJ's finding by citing to an unpublished case from the Sixth Circuit,[233] *Essary v. Commissioner of Social Security*, where the court found that the claimant failed to present evidence of functional limitations due to obesity.[234] There, the ALJ was not required to consider any additional limitations.[235] But the Seventh Circuit does not require that a claimant present evidence of functional limitations due to obesity for it to be a relevant factor (although it has determined that an ALJ's failure to explicitly address a claimant's obesity may be harmless error where it is factored indirectly into her decision).[236]

Here, because the ALJ determined that Ms. Taloff suffers from the severe impairment of obesity,[237] the ALJ may want to more specifically note the "'functional limitations resulting from the obesity,'" in conjunction with her other impairments.[238] Though we acknowledge that this may be unnecessary "when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor...."[239]

---

[233] Dkt. 23, at 7.
[234] 114 F. App'x 662, 667 (6th Cir. 2004).
[235] *Id.*
[236] *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006).
[237] R. at 20.
[238] *See Pepper v. Colvin,* 2013 WL 1338123, *11 (7th Cir. 2013)(citing SSR 02-01p); *see also Villano*, 556 F.3d at 562; *see also Barrett*, 355 F.3d at 1068.
[239] *Pepper,* 2013 WL 1338123 at *11.

## V.     CONCLUSION

For the reasons set forth above, Ms. Taloff's motion for summary judgment is granted

[dkt. 19] and the case is remanded to the SSA for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: April 11, 2013

Susan E. Cox
U.S. Magistrate Judge